# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT BENWARD and JULIE KIM-ZAJONZ, derivatively on behalf of ABIOMED, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL R. MINOGUE, TODD A. TRAPP, DOROTHY E. PUHY, JEANNINE RIVET, PAUL G. THOMAS, MARTIN P. SUTTER, and CHRIS VAN GORDER, <br><br> Defendants, <br><br> and <br><br> ABIOMED, INC., <br><br> Nominal Defendants. | C.A. No. _____ <br><br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Robert Benward ("Plaintiff Benward") and Julie Kim-Zajonz ("Plaintiff Kim-Zajonz," and together, "Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of ABIOMED, Inc. ("Abiomed" or the "Company") file this Verified Shareholder Derivative Complaint against Individual Defendants Michael R. Minogue, Todd A. Trapp, Dorothy E. Puhy, Jeannine Rivet, Paul G. Thomas, Martin P. Sutter and Chris Van Gorder, (collectively, the "Individual Defendants," and together with Abiomed, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Abiomed, unjust enrichment, waste of corporate assets and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Abiomed, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Abiomed directors and officers from at least November 1, 2018 through the present (the "Relevant Period").

2.      Abiomed was founded in 1981. The Company develops, manufactures and markets medical devices, including temporary mechanical circulatory support devices, that focus on the heart, providing a continuum of care to heart failure patients. Abiomed's products are "designed to enable the heart to rest, heal and recover" by improving blood flow and assisting the heart's ability to pump.

3.      Among other things, Abiomed, under its "Impella" brand portfolio, produces catheters and micro heart pumps with integrated motors and sensors. The devices are designed primarily for use by interventional cardiologists.

4.      Abiomed sells its products through direct sales and clinical support personnel. The clinical support personnel, consisting mainly of registered nurses and personnel with considerable relevant experience, are located in the United States, Canada, Europe and Asia.

5.      On November 1, 2018, the Company issued a press release formally announcing its 2019 second quarter financial and operating results for the quarter ended September 30, 2018[1] (the "2Q19 Press Release"). The 2Q19 Press release reported revenue of $181.8 million for the second quarter of the fiscal year ended March 31, 2019, "an increase of 37% compared to revenue of $132.8 million for the same period of fiscal 2018." In the 2Q19 Press Release, the Company also increased its fiscal year revenue guidance from $755 million to $770 million post fiscal first quarter and an initial forecast of $740 million to $770 million to $765 million to $770 million. The revenue growth Abiomed experienced during this quarter marked a high point for the Company. However, Abiomed's revenue would soon after fall into a pattern of decline over the next three quarters.

6.      On January 31, 2019, the Company issued a pre-market press release formally announcing its 2019 third quarter financial and operating results for the quarter ended December 31, 2018 (the "3Q19 Press Release"). The 3Q19 Press Release reported "third quarter fiscal 2019 revenue of $200.6 million, an increase of 30% compared to revenue of $154.0 million for the same period of fiscal 2018."

7.      On May 2, 2019, the Company issued a press release formally announcing its 2019 fourth quarter and full fiscal year financial and operating results for the quarter and year ended March 31, 2019 (the "4Q19 Press Release"). The 4Q19 Press Release reported "fourth quarter fiscal 2019 revenue of $207.1 million, an increase of 19% compared to revenue of $174.4 million

---

[1] The Company operates on a fiscal year ending on March 31.

Verified Shareholder Derivative Complaint

for the same period of fiscal 2018." Notwithstanding another quarter of declining revenue growth from the previous quarter, Defendant Michael Minogue ("Minogue"), Abiomed's President and Chief Executive Officer ("CEO"), maintained to investors that the Company had a plan that would correct this negative trend. In accordance with this plan, the Company's fiscal year 2020 guidance was "for total revenues to be in the range of $900 million to $945 million, an increase of 17% to 23% over the prior year. The company is also giving its fiscal year 2020 guidance for GAAP operating margin to be in the range of 29% to 31%."

8.    On August 1, 2019, before the market opened, Abiomed issued a press release that reported the Company's financial and operating results for the first quarter ended June 30, 2019, for the fiscal year ended March 31, 2020 (the "1Q20 Press Release"). Notably, the 1Q20 Press Release revealed the Company's third quarter in a row of slowing growth. To this point, the 1Q20 Press Release stated, "first quarter fiscal 2020 revenue of $207.7 million, an increase of 15.4% compared to revenue of $180.0 million for the same period of fiscal 2019." This represented a substantial decrease in revenue growth from the second quarter of the 2019 fiscal year. Defendant Minogue commented on the financial disappointment and stated that the Company's "new training programs, organizational changes in distribution, and [] external initiatives. . . will require time to drive more growth in the future."

9.    The Company's previously issued full-year 2020 total revenue guidance "in the range of $900 million to $945 million" was decreased by $22 million, to total revenues in the range of $885 million to $925 million.

10.    After disclosure of the Company's 1Q20 upsetting financial results, *Investor's Business Daily* ("IBD") published an article highlighting Defendant Minogue's prior statements

vowing to fix the Company's financial decline, titled: "This Medtech's CEO Promised To 'Correct The Course' – That Didn't Happen" (the "IBD Article").

11.     On this news, the Company's stock price fell $73.69 per share, from closing at $278.56 per share on July 31, 2019, to close at $204.87 per share on August 1, 2019.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operation, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company was experiencing declining revenue growth; (2)  the Company  did not implement  an adequate plan to prevent and/or mitigate its declining revenue growth; (3) as a result, the Company was  unlikely to reinstate revenue growth over the next several fiscal quarters; (4) due to (1)-(3), Abiomed would likely need to revise its full fiscal year 2020 guidance in a way that would disappoint the Company's prior projections and market expectations and; (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public while at least one of the Individual Defendants engaged in insider sales, netting proceeds of over $18.9 million.

14.     During the Relevant Period, the Individual Defendants additionally breached their fiduciary duties by causing the Company to fail to maintain internal controls.

15.     As a result of the Individual Defendants' misconduct, which has subjected Abiomed, its CEO and its Chief Financial Officer ("CFO") to being named as defendants in two federal securities fraud class action lawsuits filed in the United States District Court for the Southern District of New York (the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company has and will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in the misconduct, the substantial likelihood of the directors' liability in this derivative action, the CEO's and CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Abiomed's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

18.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     Venue is proper in this District because Abiomed and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

24.     Plaintiff Benward is a current shareholder of Abiomed common stock. Plaintiff Benward has continuously held Abiomed common stock at all relevant times. Plaintiff Benward is a citizen of New York.

25.     Plaintiff Kim-Zajonz is a current shareholder of Abiomed common stock. Plaintiff Kim-Zajonz has continuously held Abiomed common stock at all relevant times. Plaintiff Kim-Zajonz is a citizen of New York.

### Nominal Defendant Abiomed

26.     Abiomed is a Delaware corporation with its principal executive offices at 22 Cherry Hill Drive, Danvers, Massachusetts 01923. Abiomed's common stock trades on the NASDAQ under the ticker symbol "ABMD."

Verified Shareholder Derivative Complaint

**Defendant Minogue**

27.     Defendant Michael Minogue has served as the Company's Chairman of the Board and Abiomed's CEO and President since June 2004. According to the Company's Schedule 14A filed with the SEC on June 25, 2019 (the "2019 Proxy Statement"), as of June 10, 2019, Defendant Minogue beneficially owned 892,361 shares of the Company's common stock, which represented 2% of the Company's outstanding shares of common stock on that date.  Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Minogue owned approximately $243.1 million worth of Abiomed stock.

28.     For the fiscal year ended March 31, 2019, Defendant Minogue received $19,243,230 in compensation from the Company. This included $753,391 in salary, $12,605,010 in stock awards, $4,259,979 in option awards, $1,616,024 in Non-Equity Incentive Plan Compensation, and $8,826 in all other compensation.

29.     The Company's 2019 Proxy Statement stated the following about Defendant Minogue:

**Position, Principal Occupation and Professional Experience:**[2]

*Chairman, President and Chief Executive Officer, ABIOMED, Inc.* Mr. Minogue has served as our President, Chief Executive Officer and Director since April 2004. In June 2005, he was appointed Chairman of the Board of Directors. Since joining the Company in 2004, Mr. Minogue has transitioned the Company's mission to heart muscle recovery with the acquisition and development of new technologies such as the Impella®, the world's smallest heart pump. Prior to joining us, Mr. Minogue had a twelve-year career at General Electric, where he held numerous leadership positions and developed expertise in sales, marketing, product development, information technologies and software/service operations around diagnostic imaging of cancer and cardiovascular disease.

Mr. Minogue served as an infantry officer in the U.S. Army, which included multiple distinctions including Airborne, RANGER, Desert Storm Veteran and Bronze Star. He received his Bachelor of Science in Engineering Management from

---

[2] Emphasis in original, unless otherwise noted.

the United States Military Academy at West Point and his Master of Business Administration from the University of Chicago.

**Other Public Company Directorships:** Insulet Corporation.

**Other Current and Past Non-Public Company Directorships and Memberships**: Chairman of the Mentoring Veterans Program (MVPvets), a nationwide, non-profit organization that helps military veterans network with industry mentors to discover career opportunities in the life sciences industries. Mr. Minogue currently represents the medical device industry by serving on the executive board of directors for AdvaMed, or the Advanced Medical Technology Association, and is Chairman of the Medical Device Innovation Consortium (MDIC), a public-private partnership between industry, government and patient advocacy organizations. Mr. Minogue was formerly on the board of directors of LifeCell Corporation ("LifeCell") and the board of managers of Bioventus LLC ("Bioventus").

**Director Qualifications:** We believe that Mr. Minogue's leadership position at our Company, his management abilities and experience, and his extensive knowledge of our industry gained from his senior executive roles qualify him to serve as a member of our Board of Directors.

30. Upon information and belief, Defendant Minogue is a citizen of Massachusetts.

**Defendant Trapp**

31.     Defendant Todd A. Trapp ("Trapp") has served as the Company's Vice President and CFO since April 2018. According to the 2019 Proxy Statement, as of June 10, 2019, Defendant Trapp beneficially owned 386 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Trapp owned approximately $105,157 worth of Abiomed stock.

32.     For the fiscal year ended March 31, 2019, Defendant Trapp received $3,198,138 in compensation from the Company. This included $480,000 in salary, $2,372,706 in stock awards, $343,200 in Non-Equity Incentive Plan Compensation, and $3,232 in all other compensation.

33.     The Company's Schedule 2019 Proxy Statement stated the following about Defendant Trapp:

**Principal Occupation and Other Information**

Mr. Trapp was appointed as our Vice President and Chief Financial Officer on April 9, 2018. He currently oversees the Finance, IT and Human Resources functions. From April 2015 to March 2018, Mr. Trapp served as Chief Financial Officer of Watts Water Technologies, Inc., where he was responsible for the global finance and IT operations. Prior to joining Watts Water Technologies, Mr. Trapp spent 13 years in a variety of financial and operational roles at Honeywell International Inc., including as Vice President of Global Financial Planning and Analysis, Chief Financial Officer of the Airlines Business Unit, Director of Finance for the Transportation Systems Business Group, Investor Relations Manager and other finance management positions. Prior to joining Honeywell, Mr. Trapp held several treasury and finance operational roles at United Business Media, Inc. and Pearson Inc. Mr. Trapp received his Bachelor of Science in Accounting from Providence College and his Master of Business Administration in Finance from Northeastern University. He is also Six Sigma Green Belt certified.

34. Upon information and belief, Defendant Trapp is a citizen of Massachusetts.

**Defendant Puhy**

35.     Defendant Dorothy E. Puhy ("Puhy") has served as a Company director since 2003 and Lead Director since 2005. Defendant Puhy serves as the Chairman of the Audit Committee and as a member of the Regulatory and Compliance Committee. According to the 2019 Proxy Statement, as of June 10, 2019, Defendant Puhy beneficially owned 33,158 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Puhy owned approximately $9 million worth of Abiomed stock.

36.     For the fiscal year ended March 31, 2019, Defendant Puhy received $294,661 in compensation from the Company. This included $95,000 in fees earned or cash paid and $199,661 in stock awards.

37.     The Company's 2019 Proxy Statement stated the following about Defendant Puhy:

**Position, Principal Occupation and Professional Experience:**

Verified Shareholder Derivative Complaint

*Former Executive Vice President and Chief Operating Officer, Dana-Farber Cancer Institute.* Ms. Puhy served as Executive Vice President and Chief Operating Officer for the Dana-Farber Cancer Institute from 2012 until her retirement in March 2019. Ms. Puhy previously served as the Chief Financial Officer of the Dana-Farber Cancer Institute from 1994 to 2012 and as its Assistant Treasurer from 1995 to 2012. From 1985 to 1994, Ms. Puhy held various financial positions at the New England Medical Center Hospitals, Inc., including Chief Financial Officer from 1989 to 1994. Ms. Puhy received her Bachelor of Arts from the University of Pennsylvania and her Master of Business Administration from the Wharton School of Business at the University of Pennsylvania.

**Other Public Company Directorships:** Eaton Vance Corp.

**Other Current and Prior Non-Public Company Directorships, Trusteeships and Memberships:** member of the boards of directors of Blue Cross Blue Shield of Massachusetts, CRICO Strategies and United Way of Massachusetts Bay and Merrimack Valley.

**Director Qualifications**: We believe Ms. Puhy's financial acumen, her executive level experience at a major medical research institute and her extensive industry knowledge qualify her to serve as a member of our Board of Directors.

38. Upon information and belief, Defendant Puhy is a citizen of Massachusetts.

### **Defendant Rivet**

39.    Defendant Jeannine Rivet ("Rivet") has served as a Company director since 2016. Defendant Rivet serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of June 10, 2019, Defendant Rivet beneficially owned 6,946 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Rivet owned approximately $1.89 million worth of Abiomed stock.

40.    For the fiscal year ended March 31, 2019, Defendant Rivet received $267,161 in compensation from the Company. This included $67,500 in fees earned or cash paid and $199,661 in stock awards.

41.    The Company's 2019 Proxy Statement stated the following about Defendant Rivet:

**Position, Principal Occupation and Professional Experience:**

*Former Executive Vice President, UnitedHealth Group.* Ms. Rivet served as Executive Vice President of UnitedHealth Group from 2001 until her retirement in December 2018. Previously, she served as Chief Executive Officer of UnitedHealthcare from 1998 to 2001, Chief Executive Officer of Ingenix from 2001 to 2003 and Chief Executive Officer of Optum from December 2003 to 2005. Ms. Rivet received her Bachelor of Science in Nursing from Boston College and her Master's Degree in Public Health from Boston University. She also worked as a registered nurse for several years prior to entering the managed care business.

**Other Non-Public Company Directorships, Trusteeships and Memberships:** Advisory board member of Solutran, Inc., a customized treasury management company. Formerly on the board of directors of Schwan Food Company.

**Director Qualifications:**

We believe that Ms. Rivet's extensive knowledge of the managed care business, her direct healthcare experience, her executive-level experience and her management abilities and experience qualify her to serve as a member of our Board of Directors.

42. Upon information and belief, Defendant Rivet is a citizen of Minnesota.

**Defendant Sutter**

43.    Defendant Martin P. Sutter ("Sutter") has served as a Company director since 2008. Defendant Sutter serves as the Chairman of the Governance and Nominating Committee and as a member of the Compensation Committee. According to the 2019 Proxy Statement, as of June 10, 2019, Defendant Sutter beneficially owned 199,886 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Sutter owned approximately $54.45 million worth of Abiomed stock.

44.    For the fiscal year ended March 31, 2019, Defendant Sutter received $267,161 in compensation from the Company. This included $67,500 in fees earned or cash paid and $199,661 in stock awards.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sutter made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| May 8, 2019 | 4,664 | $ 260.03 | $ 1,212,779.92 |
| February 15, 2019 | 10,000 | $ 360.61 | $ 3,606,100.00 |
| February 14, 2019 | 5,000 | $ 360.00 | $ 1,800,000.00 |
| February 13, 2019 | 5,000 | $ 360.00 | $ 1,800,000.00 |
| February 6, 2019 | 5,985 | $ 347.50 | $ 2,079,787.50 |
| February 5, 2019 | 4,072 | $ 350.05 | $ 1,425,403.60 |
| February 4, 2019 | 19,943 | $ 350.79 | $ 6,995,804.97 |

Thus, in total, before the fraud was exposed, he sold 54,664 Company shares on inside information, for which he received approximately $18.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

46.     The Company's 2019 Proxy Statement stated the following about Sutter:

**Position, Principal Occupation and Professional Experience**:

*Co-Founder and a Managing Director, EW Healthcare Partners*. Since 1985, Mr. Sutter has been the Co-Founder and a Managing Director of EW Healthcare Partners, previously known as Essex Woodlands Health Ventures, a healthcare-focused growth equity firm. Educated in chemical engineering and finance, Mr. Sutter has more than 30 years of management experience in operations, marketing, finance and venture capital. Mr. Sutter holds a Bachelor of Science degree from Louisiana State University and a Master of Business Administration from the University of Houston.

**Other Current and Past Directorships, Trusteeships and Memberships**: board of managers of Bioventus, which provides orthobiologic solutions for bone healing,

Verified Shareholder Derivative Complaint

bone graft and osteoarthritis; and board of directors of Prolacta Bioscience, which provides human milk-based nutritional products for critically ill, premature infants in neonatal intensive care units. Formerly on the boards of directors of the following EW Healthcare Partners' portfolio investments: ATS Medical (later acquired by Medtronic, Inc.); BioForm Medical (later acquired by Merz GmbH & Co KGaA); LifeCell (later acquired by Kinetic Concepts); St. Francis Medical (later acquired by Kyphon, Inc./Medtronic, Inc.); Confluent Surgical (later acquired by Tyco International/Covidien); and Rinat Neurosciences (later acquired by Pfizer, Inc.). Formerly on the board of directors of QSpex Technologies, Inc., a manufacturer of prescription spectacle lenses.

**Director Qualifications**: We believe that Mr. Sutter's in-depth knowledge of the medical device industry, his skills as an investor in developing medical device companies, his extensive board experience and his position as a representative of a large stockholder in our Company qualify him to serve as a member of our Board of Directors.

47. Upon information and belief, Defendant Sutter is a citizen of Texas.

**Defendant Thomas**

48.    Defendant Paul G. Thomas ("Thomas") has served as a Company director since 2011. Defendant Thomas serves as the Chairman of the Compensation Committee, as a member of the Governance and Nominating Committee and as a member of the Regulatory and Compliance Committee. According to the 2019 Proxy Statement, as of June 10, 2019, Defendant Thomas beneficially owned 12,112 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Thomas owned approximately $3.29 million worth of Abiomed stock.

49.    For the fiscal year ended March 31, 2019, Defendant Thomas received $269,661 in compensation from the Company. This included $70,000 in fees earned or cash paid and $199,661 in stock awards.

50.    The Company's 2019 Proxy Statement stated the following about Defendant Thomas:

Verified Shareholder Derivative Complaint

**Position, Principal Occupation and Professional Experience:**

*Chief Executive Officer and Founder, Prominex, Inc.* In January 2018, Mr. Thomas founded Prominex, Inc., a start-up molecular diagnostics company focused on infectious diseases, and currently serves as its Chief Executive Officer. Prior to his employment with Prominex, Mr. Thomas served as the founder, President, Chief Executive Officer and director of Roka Bioscience, Inc. from September 2009 until his retirement in January 2017. Previously, he served as President, Chief Executive Officer and Chairman of LifeCell from October 1998 until its acquisition by Kinetic Concepts. Prior to joining LifeCell, Mr. Thomas held various senior positions, including President of the Pharmaceuticals division, during a 15-year tenure with Ohmeda Inc. Mr. Thomas received his Bachelor of Science in Chemistry from St. Michael's College and his Master of Business Administration from Columbia University, and completed his postgraduate studies in chemistry at the University of Georgia.

**Other Public Company Directorships:** RTI Surgical Holdings, Inc.

**Prior Public Company Directorships (within the last five years):** Aegerion Pharmaceuticals, Inc. (until its merger with Novelion Therapeutics in 2016).

**Director Qualifications**: We believe that Mr. Thomas' extensive leadership experience with companies in the life sciences industry qualifies him to serve as a member of our Board of Directors.

51. Upon information and belief, Defendant Thomas is a citizen of California.

### <u>Defendant Van Gorder</u>

52.     Defendant Christopher D. Van Gorder ("Van Gorder") has served as a Company director since 2016. Defendant Van Gorder serves as the Chairman of the Regulatory and Compliance Committee and as a member of the Governance and Nominating Committee and as a member of the Regulatory and Compliance Committee. According to the 2019 Proxy Statement, as of June 10, 2019, Defendant Van Gorder beneficially owned 5,836 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 10, 2019 was $272.43, Defendant Van Gorder owned approximately $1.58 million worth of Abiomed stock.

53.    For the fiscal year ended March 31, 2019, Defendant Van Gorder received $264,661 in compensation from the Company. This included $65,000 in fees earned or cash paid and $199,661 in stock awards.

54.    The Company's 2019 Proxy Statement stated the following about Defendant Van Gorder:

**Position, Principal Occupation and Professional Experience:**

*President, Chief Executive Officer and Director of Scripps Health.* Since 2000, Mr. Van Gorder has been President, Chief Executive Officer and a director of Scripps Health, where he oversees all functions of the integrated health system. Mr. Van Gorder currently is a clinical professor of health practice at the University of Southern California Price School of Public Policy, where he also serves on the board of councilors. Mr. Van Gorder received his undergraduate degree from California State University, Los Angeles, and his master's degree in public administration/health services administration from the University of Southern California. He has also completed the Chief Executive Officer Program at the Wharton School of Business at the University of Pennsylvania.

**Other Current and Prior Non-Public Company Directorships, Trusteeships and Memberships:** member of the boards of directors of the California Hospital Association and Z-Medica, LLC. Formerly on the board of governors for the American College of Healthcare Executives.

**Director Qualifications:** We believe that Mr. Van Gorder's experience as a business leader, his expertise in the healthcare field and his executive level industry experience qualify him to serve as a member of our Board of Directors.

55. Upon information and belief, Defendant Van Gorder is a citizen of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.    By reason of their positions as officers and/or directors and fiduciaries of Abiomed and because of their ability to control the business and corporate affairs of Abiomed, the Individual Defendants owed Abiomed and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Abiomed in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Abiomed and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to Abiomed and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Abiomed, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Abiomed were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Abiomed, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Abiomed's Board at all relevant times.

61.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC including all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

62.    To discharge their duties, the officers and directors of Abiomed were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Abiomed were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Abiomed's own Code of Conduct and Compliance Policy and the Charter of the Audit Committee;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Abiomed conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Abiomed and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Abiomed's operations would comply with all applicable laws and Abiomed's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to Abiomed and the shareholders the duty of loyalty requiring that each favor Abiomed's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Abiomed and were at all times acting within the course and scope of such agency.

65.    Because of their advisory, executive, managerial, and directorial positions with Abiomed, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Abiomed.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

68.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Exchange Act.

69.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred

under the authority of the Board, each of the Individual Defendants, who are directors of Abiomed, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

70.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Abiomed and was at all times acting within the course and scope of such agency.

## ABIOMED'S CODE OF CONDUCT

72.    The Company's Code of Conduct and Compliance Policy (the "Code of Conduct") states, that "[t]he Compliance Code applies to all ABIOMED employees, including its Board of Directors…". The Code of Conduct further states, that "[a]ll ABIOMED Representatives are responsible for complying with this Compliance Code and its related policies and procedures, and for reporting any potential violation."

73.    The Code of Conduct provides, in the section titled "Auditing and Monitoring," that "the [Company's] Compliance Program includes efforts to monitor, audit, and evaluate conformance with the Company's compliance policies and procedures, including efforts to monitor the activities of sales force personnel."

74.    The Code of Conduct provides, in the section titled "Accurate Records and Reporting," that:

ABIOMED is required by law to keep books, records and accounts that accurately and fairly reflect all transactions, dispositions of assets and other events that are the subject of specific regulatory record keeping requirements, including generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements and for preparing periodic reports filed with the SEC. Because the integrity of ABIOMED's external reports to shareholders and to the SEC depends on the integrity of ABIOMED's internal reports and record-keeping, you must adhere to the highest standards of care with respect to our internal records and reporting. ABIOMED is committed to full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by it with the SEC, and it expects you to work diligently towards that goal.

If you believe ABIOMED's books and records are not in accord with these requirements, you should immediately report the matter to a member of the Compliance Committee or to the anonymous and independent compliance reporting hotline at 888-475-8376. Employee concerns or complaints may be made anonymously. There will be no retaliation or discrimination against any employee who provides information about any conduct that the employee in good faith believes involves concerns about the accuracy of ABIOMED's books, 15 2821639 records and accounts.

Our Company's internal control procedures are further regulated by the Sarbanes-Oxley Act ("SOX"). SOX is a U.S. legislative response to events at public companies involving pervasive breakdowns in corporate ethics and financial reporting. It is designed to rebuild confidence in the capital markets by ensuring that public companies are operated in a transparent and honest manner. Ensuring proper and effective internal controls is among ABIOMED's highest priorities.
We take seriously the reliance our investors place on us to provide accurate and timely information about our business. In support of our disclosure obligations, it is ABIOMED's policy to always:

- Comply with generally accepted accounting principles;
- Maintain a system of internal accounting and disclosure controls and procedures that provides management with reasonable assurances that transactions are properly recorded and that material information is made known to management;
- Maintain books and records that accurately and fairly reflect transactions;
- Prohibit establishment of material undisclosed or unrecorded funds or assets; and
- Make no payment on behalf of ABIOMED with the intention or understanding that all or part of such payment will be used for any purpose other than that described by the document supporting the payment.

75.    The Code of Conduct provides, in the section titled "Insider Trading," that:

ABIOMED expressly forbids you from trading on material non-public information or communicating material non-public information to others. Such conduct, which is illegal, is frequently referred to as "insider trading." This policy applies to every associate of ABIOMED and extends to activities both within and outside their duties to ABIOMED, including trading for a personal account.

## CHARTER OF THE AUDIT COMMITTEE

76.    Defendant Puhy serves as the Chairman of the Audit Committee and Defendant Rivet and non-party Eric A. Rose ("Rose") serve as members of the Committee.

77.    The Audit Committee's Charter states that the purpose of the Audit Committee, is:

to perform general oversight of the accounting and financial reporting processes of the ABIOMED, Inc. and its subsidiaries (the "Company") and the audits of the financial statements of the Company. The Committee shall assist the Board of Directors (the "Board") of the Company in fulfilling its oversight responsibilities relating to: (a) the quality and integrity of the Company's financial statements and other financial reports; (b) the Company's system of internal accounting controls; (c) the performance of the Company's internal and independent auditors; and (d) the Company's compliance with legal and regulatory requirements.

78.    Pursuant to the Charter, the Audit Committee has many responsibilities, namely:

8.    Review with management and the independent auditors at the completion of the annual audit:
• the Company's annual financial statements and related footnotes, and the Company's compliance with generally accepted accounting principles and applicable regulations of the Securities and Exchange Commission ("SEC");
• the independent auditors' audit of the financial statements and the independent auditors' report thereon, including a review of any significant changes required in the independent auditors' audit plan;
• any changes in accounting principles of the Company; and
• any other matters related to the conduct of the audit or the audit findings as are required to be communicated to the Committee under generally accepted auditing standards and any applicable SEC regulations.
9.    Review and discuss with management and the independent auditors the Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, quarterly and annual earnings press releases and information prepared by the Company for its regular public conference telephone calls concerning its

earnings and results of operations in the context of information provided to the Audit Committee and the Board.

\*       \*       \*

12. Review the adequacy and effectiveness of the Company's system of internal controls, policies and procedures, and approve policies relating to internal controls and protection of the Company's assets.

79.    The Individual Defendants violated the Code of Conduct and the Charter of the Audit Committee by causing the Company to engage in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violation of Section 14(a) and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

80.    Abiomed was founded in 1981 with the goal to develop the first artificial heart and, according to its website, the Company "remain[s] dedicated to finding ways to bring the most advanced and beneficial technology to patients and physicians."[3] Six years later, Abiomed began trading on the NASDAQ and closed its first year with $1.5 million in revenue.

81.    The main component of Company's revenue growth is the Company's family of Impella® heart pumps. Abiomed's portfolio of Impella devices include the Impella 2.5®, Impella CP®, Impella RP®, Impella LD® and Impella 5.0® devices. The Company expects to derive all of its forthcoming product and service revenue from its Impella devices in the near future.

---

[3] ABIOMED, http://www.abiomed.com/about. Last visited November 1, 2019.

**False and Misleading Statements**

*November 1, 2018 Press Release and Conference Call*

82.    On November 1, 2018, the Company issued the 2Q19 Press Release formally announcing its 2019 second quarter financial and operating results for the quarter ended September 30, 2018. The 2Q19 Press Release stated that "second quarter fiscal 2019 revenue of $181.8 million, an increase of 37% compared to revenue of $132.8 million for the same period of fiscal 2018." The 37% comparative increase in Abiomed's revenue marked the high point in the Company's revenue growth, which began depreciating over the following quarters.

83.    The 2Q19 Press Release proclaimed that the revenue was "[r]ecord [r]evenue" as stated in the title of the press release. Further, Defendant Minogue stated, "We are executing our plan for sustainable growth while helping to improve [patient outcomes focused on native heart recovery."

84.    The 2Q19 Press Release went on to state that the Company was increasing its financial guidance for fiscal year ended March 31, 2019. To this point, the 2Q19 Press Release stated, in relevant part:

> The Company is again increasing the low end of its fiscal year 2019 revenue guidance to $765 million to $770 million (up 29% to 30% over the prior fiscal year). This compares to the post fiscal first quarter guidance of $755 million to $770 million (up 27% to 30% over the prior fiscal year) and the Company's initial forecast of $740 million to $770 million (up 25% to 30% from the prior year). The Company is maintaining its fiscal year 2019 guidance for GAAP operating margin in the range of 28% to 30%.

85.    On the same day, the Company hosted a conference call with investors and analysts (the "2Q19 Conference Call"). During the call, Defendant Minogue touted that, "Abiomed is positioned for sustainable growth and building the field of heart recovery with disciplined execution" and "[the Company] [is] executing [its] plan for sustainable growth[.]" Defendant

Minogue, further, stated, that "[the Company] [is] following [its] Impella adoption formula of training data and time[]" and "…Abiomed is improving training and education[.]"

86.    Defendant Trapp stated on the 2Q19 Earnings Call, in relevant part, that:

Given our execution and our strong first half performance, we are again raising the low end of our full year revenue guidance by $10 million to a new range of $765 million to $770 million, up 29% to 30% for the year.

The previous guidance, post Q1, was $755 million to $770 million, up 27% to 30% for the year. We expect to see solid growth in the second half[.]

87.    Defendant Trapp further assured investors that Abiomed was "well positioned to deliver [its] plan for 2019 and beyond."

***November 6, 2018 10-Q***

88.    On November 6, 2018, the Company filed its second quarterly report with the SEC on a Form 10-Q for the quarter ended September 30, 2018 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendant Trapp and attached as exhibits to the 2Q19 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Trapp and Defendant Minogue attesting to the accuracy of the 2Q19 10-Q. The 2Q19 10-Q affirmed the aforementioned 2Q19 Press Release and 2Q19 Conference Call and further reported on the Company's financial and operating results. The 2Q19 10-Q reported a net income of $50.13 million, or $1.09 per diluted share, on revenue of $181.78 million for the quarter ended September 30, 2018, compared to a net income of $24.50 million, or $0.54 per diluted share, on revenue of $132.82 million for the second quarter of the 2018 fiscal year.

89.    In further regard to the Company's revenue for the second quarter, the 2Q19 10-Q stated, in relevant part:

Total revenue for the three months ended September 30, 2018 increased by $49.0 million, or 37%, to $181.8 million from $132.8 million for the three months ended September 30, 2017. Total revenue for the six months ended September 30, 2018 increased $96.5 million, or 36%, to $361.8 million from $265.3 million for the six months ended September 30, 2017. The increase in total revenue was primarily due to higher Impella product revenue from increased utilization in the U.S and Europe and our continued controlled commercial launch of Impella 2.5 and Impella 5.0 in Japan.

Impella product revenue for the three months ended September 30, 2018 increased by $47.9 million, or 38%, to $175.3 million from $127.4 million for the three months ended September 30, 2017. Impella product revenue for the six months ended September 30, 2018 increased $94.3 million, or 37%, to $348.9 million from $254.6 million for the six months ended September 30, 2017. Most of the increase in Impella product revenue was from increased device sales in the U.S., as we focus on increasing utilization of our disposable catheter products through continued investment in our field organization and physician training programs. Impella product revenue outside of the U.S. also increased primarily due to increased utilization in Germany and our continued controlled launch of Impella 2.5 and Impella 5.0 in Japan.

Service and other revenue for the three months ended September 30, 2018 increased by $1.1 million, or 20%, to $6.5 million from $5.4 million for the three months ended September 30, 2017. Service and other revenue for the six months ended September 30, 2018 increased $2.1 million, or 20%, to $12.8 million from $10.7 million for the six months ended September 30, 2017. The increase in service revenue was primarily due to an increase in preventative maintenance service contracts. We have expanded the number of Impella AIC consoles at many of our existing higher volume customer sites and continue to sell additional consoles to new customer sites. We expect growth for service revenue to be slower than our Impella product revenue in the future as most of these using sites in the U.S. have service contracts that normally have three year terms.

90.    The 2Q19 10-Q stated, in relevant part, about the Company's cost of revenue for

the second quarter:

Cost of revenue for the three months ended September 30, 2018 increased by $8.2 million, or 38%, to $29.8 million from $21.6 million for the three months ended September 30, 2017. Gross margin was 83.6% for the three months ended September 30, 2018 and 83.7% for the three months ended September 30, 2017.

Cost of revenue for the six months ended September 30, 2018 increased by $17.2 million, or 40%, to $60.7 million from $43.5 million for the six months ended September 30, 2017. Gross margin was 83.2% for the six months ended September 30, 2018 and 83.6% for the six months ended September 30, 2017.

The increase in cost of product revenue was related to higher demand for our Impella devices and higher production volume and costs to support growing demand for our Impella devices. The small decrease in gross margin for the three and six months ended September 30, 2018 was due to higher volume offset by increased investment in direct labor and overhead as we expand our manufacturing capacity in our manufacturing facilities in both the U.S. and Germany.

*January 31, 2019 Press Release*

91.      On January 31, 2019, the Company issued the 3Q19 Press Release formally announcing its 2019 third quarter financial and operating results for the quarter ended December 31, 2018. The 3Q19 Press Release reported that revenue growth dropped to an increase of 30% for the quarter, compared to the 37% increase reported in the 2Q19 Press Release. Notwithstanding this fact, the title of the 3Q19 Press Release still read "[r]ecord [r]evenue" and stated, in relevant part:

> Abiomed, Inc. (NASDAQ: ABMD), a leading provider of breakthrough heart recovery and support technologies, today reported third quarter fiscal 2019 revenue of $200.6 million, an increase of 30% compared to revenue of $154.0 million for the same period of fiscal 2018. Third quarter fiscal 2019 GAAP net income was $44.9 million or $0.97 per diluted share, up 235% compared to GAAP net income of $13.4 million or $0.29 per diluted share for the same period of fiscal 2018.

92.      Defendant Minogue, flaunting the Company's continued growth, stated in the 3Q19 Press Release:

> We are proud of our 100,000th patient milestone and we will continue to grow the field of heart recovery and improve patient outcomes by partnering with our customers to use real-world data to identify and validate best practices and protocols . . . We remain focused on disciplined execution and sustainable growth so that even more patients around the world can benefit from heart recovery.

*February 5, 2019 10-Q*

93.      On February 5, 2019, the Company filed its third quarterly report with the SEC on a Form 10-Q for the quarter ended December 31, 2018 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendant Trapp and contained SOX certifications signed by Defendant Trapp and

Verified Shareholder Derivative Complaint

Defendant Minogue attesting to the accuracy of the 3Q19 10-Q. The 3Q19 10-Q affirmed the aforementioned 3Q19 Press Release and further reported on the Company's financial and operating results. The 3Q19 10-Q reported a net income of $44.86 million, or $0.97 per diluted share, on revenue of $200.56 million for the quarter ended December 31, 2018, compared to a net income of $13.45 million, or $0.29 per diluted share, on revenue of $154.02 million for the third quarter of the 2018 fiscal year.

94.    In further regard to the Company's revenue for the third quarter, the 3Q19 10-Q stated, in relevant part:

> Total revenue for the three months ended December 31, 2018 increased by $46.6 million, or 30%, to $200.6 million from $154.0 million for the three months ended December 31, 2017. Total revenue for the nine months ended December 31, 2018 increased $143.1 million, or 34%, to $562.4 million from $419.3 million for the nine months ended December 31, 2017. The increase in total revenue was primarily due to higher Impella product revenue from increased utilization in the U.S and Europe and our continued controlled commercial launch of Impella 2.5 and Impella 5.0 in Japan.
>
> Impella product revenue for the three months ended December 31, 2018 increased by $45.3 million, or 31%, to $193.3 million from $148.0 million for the three months ended December 31, 2017. Impella product revenue for the nine months ended December 31, 2018 increased $139.6 million, or 35%, to $542.2 million from $402.6 million for the nine months ended December 31, 2017. Most of the increase in Impella product revenue was from increased device sales in the U.S., as we focus on increasing utilization of our disposable catheter products through continued investment in our field organization and physician training programs. Impella product revenue outside of the U.S. also increased primarily due to increased utilization in Germany and our continued controlled launch of Impella 2.5 and Impella 5.0 in Japan.
>
> Service and other revenue for the three months ended December 31, 2018 increased by $1.3 million, or 22%, to $7.3 million from $6.0 million for the three months ended December 31, 2017. Service and other revenue for the nine months ended December 31, 2018 increased $3.5 million, or 21%, to $20.2 million from $16.7 million for the nine months ended December 31, 2017. The increase in service and other revenue was primarily due to an increase in preventative maintenance service contracts. We have expanded the number of Impella AIC consoles at many of our existing higher volume customer sites and continue to sell additional consoles to new customer sites. We expect growth for service and other revenue to be slower than our Impella product revenue in the future as most of these using sites in the U.S. have service contracts with three year terms.

95.    The 3Q19 10-Q stated, in relevant part, about the Company's cost of revenue for

the third quarter:

> Cost of revenue for the three months ended December 31, 2018 increased by $9.0
> million, or 36%, to $34.0 million from $25.0 million for the three months ended
> December 31, 2017. Gross margin was 83.0% for the three months ended December
> 31, 2018 and 83.8% for the three months ended December 31, 2017.
>
> Cost of revenue for the nine months ended December 31, 2018 increased by $26.2
> million, or 38%, to $94.7 million from $68.5 million for the nine months ended
> December 31, 2017. Gross margin was 83.2% for the nine months ended
> December 31, 2018 and 83.7% for the nine months ended December 31, 2017.
>
> The increase in cost of product revenue was related to higher demand for our
> Impella devices and higher production volume and costs to support growing
> demand for our Impella devices. The decrease in gross margin for the three and
> nine months ended December 31, 2018 was due to higher volume offset by
> increased investment in direct labor and overhead as we expand our manufacturing
> capacity to support expected growth in our Impella business.

### *May 2, 2019 Press Release and Conference Call*

96.    On May 2, 2019, the Company issued the 4Q19 Press Release formally announcing

its 2019 fourth quarter and full fiscal year financial and operating results for the quarter and year

ended March 31, 2019. The 4Q19 Press Release specifically reported in relevant part:

> Abiomed, Inc. . . . a leading provider of breakthrough heart recovery and support
> technologies, today reported fourth quarter fiscal 2019 revenue of $207.1 million,
> ***an increase of 19%*** compared to revenue of $174.4 million for the same period of
> fiscal 2018. For fiscal year 2019, total revenue was $769.4 million, up 30%
> compared to revenue of $593.7 million, and operating income was $224.8 million,
> up 43% compared to operating income of $157.1 million in fiscal year 2018.

(Emphasis added).

97.    Defendant Minogue, as quoted in the 4Q19 Press Release, admitted that the

Company's fourth quarter results were disappointing. Still, he lauded the Company's "long-term

outlook" and stated that the Company has "already initiated a plan of action to correct the course."

Defendant Minogue affirmed his confidence in the Company's growth and achievements,

Verified Shareholder Derivative Complaint

emphasizing his positive outlook for the Company's prospects. Specifically, Defendant Minogue

stated in relevant part:

> Q4 did not meet our expectations. I take full responsibility for our disappointing
> performance given a soft March, and we have already initiated a plan of action to
> correct the course. However, Abiomed had a solid year with 30% growth and
> improvement in margins. Most importantly, Abiomed's clinical support, training,
> and education helped improve patient outcomes in both high-risk PCI and
> cardiogenic shock. Multiple publications continue to validate the benefits of
> Impella supported PCI and Impella best practices to help improve survival in
> cardiogenic shock. . . . I am confident in our innovation and business today as well
> as long-term outlook for Abiomed. We are creating the new Field of Heart
> Recovery.

98.    With respect to the Company's fiscal year 2020 outlook, the 4Q19 Press Release

stated, in relevant part:

> **FISCAL YEAR 2020 OUTLOOK**
>
> The company is giving its fiscal year 2020 guidance for total revenues to be in the
> range of $900 million to $945 million, an increase of 17% to 23% over the prior
> year. The company is also giving its fiscal year 2020 guidance for GAAP operating
> margin to be in the range of 29% to 31%. The company plans to give another formal
> forecast for the fiscal year on the next earnings call.

99.    On the same day, the Company hosted a conference call with investors and analysts

(the "4Q19 Conference Call"). On the 4Q19 Conference Call, Defendant Minogue spoke about the

Company's "plan of action… to correct the course." To this point, Defendant Minogue explained

steps the Company had taken since the first fiscal quarter and promised investors that the

Company's performance "will rise up [,]" stating in relevant part:

> Thank you, Ingrid, and good morning, everyone. By now you've seen our press
> release, and I want to begin by recognizing that our performance in Q4 did not meet
> our expectations. I take full responsibility for our disappointing performance given
> a soft March. And I will discuss momentarily the changes and plan of action we
> have already initiated to correct the course.
>
> In the quarter, we generated $207 million in revenue, up 19%. We had anticipated
> a tough comparison given the 40% growth in the prior year period, but our results
> were short of our goal of 25% growth or $218 million. Operating margins for Q4
> were strong and expanded to 31.6%.

For the full fiscal year, revenue of $769 million increased 30% versus the fiscal year 2018. Additionally, operating margins increased to 29.2%. In fiscal '19, we remain one of the fastest-growing GAAP profitable medical device companies. Abiomed has a long and proven track record of execution, posting over 20% in organic revenue growth for 18 consecutive quarters or 4.5 years while significantly expanding full year operating margins from 12.5% to 29.2%. During this time, we also invested nearly $1 billion in innovation, clinical research and distribution. We remain confident in our business and our short to long-term outlook. We're confirming that our investment thesis remains fully intact.

For today's call, I will cover 3 topics: first, I will discuss the Q4 lessons learned and the actions already taken for Q1…

\*       \*       \*

So first, on Q4. It is important to note that our business typically sees significant sequential performance in Q4. Unfortunately, this is -- did not occur because of the slower growth in March in patient utilization. We believe this occurred as a result of customer confusion stemming from the February 4 FDA letter to healthcare providers from the FDA coupled with our response to prioritize Impella RP and shock, which unintentionally distracted our focus away from Protected PCI execution. Unfortunately, this FDA letter to healthcare providers was misinterpreted by some media outlets and healthcare providers who inaccurately reported that Impella RP, or Impella, was being recalled or had overall safety issues that were being reviewed by the FDA. This was clearly not the case, which we clarified in our ACC press release, March 18.

We believe this noise negatively impacted our elective high-risk PCI patients in the cath Lab specifically in March. We also believe competitive companies likely capitalized on the confusion with our customers. Additionally, contracted survey companies called our customers to inform them of the FDA letter and questioned if they would reduce using Impella until final resolution. However, our internal shift in focus did likely yield improved clinical outcomes for Impella RP patients and resulted in a record quarterly revenue for Impella RP. There are other miscellaneous items that may have had an impact in the quarter, but generally, they fall into 2 categories: external noise or internal focus.

We have already made the following changes to address the March performance. The Impella RP post-approval study was presented and press released at the ACC meeting on March 18. The FDA now differentiates patients in the Recover Right protocol from salvage patients with right ventricular failure in shock for 48 hours or more. To be clear, the patient's in the postapproval study that met the FDA criteria for right heart failure had similar outcomes to the FDA RP Recover Right Study, which led to the exclusive FDA approval. With the postapproval study submitted to the FDA, we anticipate a final closing FDA letter to healthcare physicians to be issued to our customers by the end of our fiscal year Q1 that stresses the importance of early identification of right ventricular cardiogenic shock and reinforces our safe and effective approval for Impella RP. Additionally, we

have taken the following steps, which we believe will eliminate noise and highlight the clinical benefits of Impella for both interventional cardiologist and the heart failure community, which includes heart surgeons. We capitalized on the timing of our annual Abiomed Field Meeting with 3 days of training, with over 400 employees and on all the new publications for high-risk PCI and shock. This meeting was last week.

We also highlighted our last 2 press release -- press releases on both high-risk PCI and cardiogenic shock. We have created 2 new U.S. regions for our core business, increasing the number of territories and account managers allowing us to go deeper with interventional cardiologist. We added 4 new MDs to our medical office to expand our training and education programs in headquarters at our Heart Recovery Institute and regionally in the field, and we also expanded our distribution channel focused on the heart team, including heart surgeons, to maintain our momentum on Impella 5.0 and Impella RP and prepare for future Impella 5.5 launch. We believe these actions we have taken will help reduce the noise. However, it will likely require at least a quarter of execution to eliminate all confusion on the Impella platform.

For this reason, we are disclosing today that our U.S. April growth rate showed improvement over March, but it is not yet where we want it to be. We will rise up. We have more work to do to educate our customers on improving outcomes and recent publications. And we will leverage the final pending FDA confirmation letter. Our business is based on the integrity of our products, the relationships we have with hospitals and physicians and our reputation. When there is confusion in the market about the safety of our products, it takes time and effort to get back on track.

### *2019 10-K*

100.    On May 23, 2019, the Company filed its annual report with the SEC on a Form 10-K for the year ended March 31, 2019 (the "2019 10-K"), signed by Defendants Minogue, Trapp, Puhy, Rivet, Sutter, Thomas, Van Gorder, and non-party Rose. Attached to the 2019 10-K were SOX certifications signed by Defendants Minogue and Trapp attesting to the accuracy of the 2019 10-K.

101.    The 2019 10-K stated that for the 2019 fiscal year, the Company had a net income of $259.02 million, or $5.61 per diluted share, on revenue of $769.43 million, compared to a net income of $112.17 million, or $2.45 per diluted share, on revenue of $593.75 million for the 2018 fiscal year.

102.    The 2019 10-K further discussed the Company's revenue performance for the 2019

fiscal year compared to the prior year ended March 31, 2018, stating in relevant part:

> Total revenue for fiscal 2019 increased $175.7 million, or 30%, to $769.4 million
> from $593.7 million for fiscal 2018. Impella product revenue for fiscal 2019
> increased by $170.8 million, or 30%, to $741.7 million from $570.9 million for
> fiscal 2018. Most of the increase in Impella product revenue was from increased
> device sales in the U.S., as we focus on increasing utilization of our disposable
> catheter products through continued investment in our field organization and
> physician training programs. Impella product revenue outside of the U.S. also
> increased primarily due to higher utilization in Germany and our controlled launch
> of Impella 2.5 and Impella 5.0 in Japan.

> Service and other revenue for fiscal 2019 increased by $4.8 million, or 21%, to
> $27.7 million from $22.9 million for fiscal 2018. The increase in service and other
> revenue was primarily due to an increase in preventative maintenance service
> contracts. We expect growth for service and other revenue to be slower than our
> Impella product revenue in the near future as most of our U.S. customers have
> service contracts with three-year terms.

103.    The 2019 10-K also included a discussion on the Company's cost of revenue for

the 2019 fiscal year, stating that:

> Cost of revenue for fiscal 2019 increased by $31.0 million, or 31%, to $129.6
> million from $98.6 million for fiscal 2018. Gross margin was 83% for each of fiscal
> 2019 and fiscal 2018. The increase in cost of product revenue was related to higher
> demand for our Impella devices and higher production volume and costs to support
> growing demand for our Impella devices. There was a minimal difference in gross
> margin as the increased investment in manufacturing capacity was at a pace
> consistent with our revenue growth.

104.    The 2019 10-K further contained non-specific, boilerplate comments about the

Company's revenue risk. For example, the 2019 10-K stated:

> ***Expansion into hospital cardiac centers that have not historically used our
> products may incur long sales and training cycles that may cause our revenues
> and operating results to vary significantly from quarter to quarter.***

> Our products have lengthy sales cycles and we may incur substantial sales and
> marketing expenses and expend significant effort without making a sale. We sell
> primarily to hospitals that often have administrative requirements to introduce and
> expand a new technology, such as Impella devices, at their sites. Even after making
> the decision to purchase our Impella devices, our customers often deploy our
> products slowly or infrequently. In addition, cardiac centers of hospitals that buy

the majority of our products are usually led by cardiac surgeons who are heavily recruited by competing hospitals. When one of these cardiac surgeons moves to a new hospital, we sometimes experience a significant reduction in purchases by the hospital from which the physician has departed while it replaces the lead physician supporting our Impella devices. As a result, our revenues and operating results may vary significantly from quarter to quarter. In addition, product purchases often lag behind initial expressions of interest in our product by new centers due to training and education regarding the use of the products. Hospitals also need to perform internal administrative requirements prior to the initial implant procedures.

105.    The statements in ¶¶80-104 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was experiencing declining revenue growth; (2)  the Company  did not implement  an adequate plan to prevent and/or mitigate its declining revenue growth; (3) as a result, the Company was  unlikely to reinstate revenue growth over the next several fiscal quarters; (4)  due to (1)-(3), Abiomed would likely need to revise its full fiscal year 2020 guidance in a way that would disappoint the Company's prior projections and market expectations and; (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *2019 Proxy Statement*

106.    On June 25, 2019, the Company filed its 2019 Proxy Statement with the SEC. Defendants Minogue, Puhy, Rivet, Sutter, Thomas and Van Gorder solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act which contained material misstatements and omissions.[4]

---

[4] Plaintiffs' allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud.

107.    The 2019 Proxy Statement stated, regarding the Company's Code of Conduct posted on the Company's website that, "All of [the Company's] directors, officers and employees are expected to act ethically, legally and with integrity at all times and are obligated to comply with our Code of Conduct and Compliance Policy[.]"

108.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evident by the numerous false and misleading statements alleged herein, the insider trading engaged in by one of the Individual Defendants, and the Individual Defendant's failures to report violations of the Code of Conduct.

109.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements. The 2019 Proxy Statement stated that one of the "primary objectives of [the Company's] executive compensation program" is to "tie executive compensation to performance objectives and long-term stockholder returns," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was experiencing declining revenue growth; (2) the Company did not implement an adequate plan to prevent and/or mitigate its declining revenue growth; (3) as a result, the Company was unlikely to reinstate revenue growth over the next several fiscal quarters; (4) due to (1)-(3), Abiomed would likely need to revise its full fiscal year 2020 guidance in a way that would disappoint the Company's prior projections and market expectations and; (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

Verified Shareholder Derivative Complaint

## The Truth Begins to Emerge

*August 1, 2019 Press Release*

110.    On August 1, 2019, Abiomed issued the 1Q20 Press Release, reporting the Company's financial and operating results for the first quarter of the 2020 fiscal year ended June 30, 2019. The 1Q20 Press Release revealed the Company's third quarter in a row of declining revenue growth. Specifically, the 1Q20 Press Release stated, "first quarter fiscal 2020 revenue of $207.7 million, an increase of 15.4% compared to revenue of $180.0 million for the same period of fiscal 2019. Operating income was $60.7 million, up 30%, compared to $46.7 million in the same period of fiscal 2019." Overall, the 1Q20 revealed a decrease in the Company's revenue growth of over 58% from the second quarter results reported in the 2Q19 Press Release. When juxtaposed against the 37% growth in revenue reported in the second quarter of 2019, the 15.4% comparative increase in Abiomed's revenue represented a decrease of over 58% from second quarter 2019's revenue growth (compared to second quarter 2018). Moreover, the reported revenue growth also represented a decrease of nearly 50% from the Company's third quarter 2019 revenue growth of 30% (compared to third quarter 2018). In addition, the 1Q20 Press Release disclosed that the Company's previously issued full-year 2020 total revenue guidance "in the range of $900 million to $945 million" was cut significantly, by $22 million, to revised total revenues in the range of $885 million to $925 million. The 1Q20 Press Release stated, in relevant part:

> Abiomed, Inc. (NASDAQ: ABMD), a leading provider of breakthrough heart recovery and support technologies, today reported first quarter fiscal 2020 revenue of $207.7 million, an increase of 15.4% compared to revenue of $180.0 million for the same period of fiscal 2019. Operating income was $60.7 million, up 30%, compared to $46.7 million in the same period of fiscal 2019.

> "In Q1, we implemented new training programs, organizational changes in distribution, and launched external initiatives that will require time to drive more growth in the future," said Abiomed Chairman, President and CEO, Michael R. Minogue. "We are confident in our ultimate global adoption because we know that our innovation improves clinical outcomes and patient quality of life."

\*      \*      \*

**FISCAL YEAR 2020 OUTLOOK**

The company is revising its fiscal year 2020 guidance for total revenues to be in the range of $885 million to $925 million, an increase of 15% to 20% over the prior year. The company is also revising its fiscal year 2020 guidance for GAAP operating margin to be in the range of 28% to 30%.

111.    After release of the Company's 1Q20 disappointing disclosures regarding its financial performance, IBD published the IBD Article, highlighting Defendant Minogue's prior statements vowing to fix he Company's financial decline.

112.    The IBD Article reported that "Abiomed stock tumbled well below its 50-day moving average. Shares have largely trended down this year []" and further emphasized that "[t]his was Abiomed's second consecutive quarter of light sales." The IBD Article also pointed out Defendant Minogue's promises to mitigate the Company's performance—citing to several statements made by him during the course of the year, stating in relevant part:

In the March quarter, Chief Executive Michael Minogue promised to "correct the course." But in the fiscal first quarter ended June 30, sales grew 15.4% to $207.7 million, below estimates for $210.7 million.

Minogue cautioned in a written statement that it would take time for new efforts to stoke growth.

"We implemented new training programs, organizational changes in distribution and launched external initiatives that will require time to drive more growth," he said. "We are confident in our ultimate global adoption because we know that our innovation improves clinical outcomes and patient quality of life."

113.    The IBD Article further reported on the Company's "trend of deceleration" and pointed to analysts' expectations, stating in relevant part:

Revenue growth has slowed for three straight quarters now. In the fiscal first quarter, adjusted earnings of $1 per share grew 28%, but that decelerated from 65% growth in the prior quarter.

As a result, **Abiomed's guidance** for the full year lagged expectations. The medical technology company expects $885 million to $925 million in fiscal year 2020 sales. That would rise 15%-20% over the prior year. But analysts projected $927.1 million in sales.

114.     The same day, *Bloomberg* published an article titled, "Heart-Pump Stock Goes from First to Worst as Growth Cools" (the "Bloomberg Article"). The Bloomberg Article pointed out the Company's prior performance and tracked the decline in the Company's stock price as well as its continued missed revenue performance, stating in relevant part:

> Abiomed Inc., a former darling among stock investors, has wiped out a year and a half of gains.
>
> The company that was the best performing large-cap health-care stock and the second best performer in the S&P 500 Index for 2018 is now the worst performer in both the sector and the broader benchmark this year. Shares in the maker of the world's smallest heart pump plunged as much as 29% on Thursday after sales missed estimates for a second straight quarter, stoking worries about a slowdown in revenue growth.
> Over a four-year stretch ending with its October 1 intraday peak, the Boston-area company rode a boom of more than 1,700% from small-cap device maker to S&P 500 powerhouse with a $20 billion market value. At its highest level, at least two analysts were projecting the stock could reach $500 or higher. Now, shares are trading around $200 apiece, leading one bullish sell-side analyst to throw in the towel.

115.     The Bloomberg Article also quoted BTIG analyst Sean Lavin, who expressed his surprise at the Company's poor performance, stating in relevant part:

> "We are surprised," BTIG analyst Sean Lavin wrote in a note to clients. "Frankly, we got our previous upgrade wrong and would rather just admit that than be stubborn and maintain our buy rating."
>
> Lavin cut the stock to neutral from buy -- Abiomed's first hold-equivalent rating since late last year, Bloomberg data show. Investors who might have bought the stock in response to BTIG's Nov. 2 upgrade would have lost around 48% of their investment, while the S&P 500 gained about 9% over that time
>
> Abiomed's current year-to-date drop of 38% puts it at the bottom of the S&P, below Nordstrom Inc., Gap Inc. and fellow health-care stock AbbVie Inc.

Verified Shareholder Derivative Complaint

116.    On this news, the Company's stock price fell $73.69 per share, from close on July 31, 2019 at $278.56 to close on August 1, 2019 at $204.87.

117.    On October 31, 2019, the Company issued a press release formally announcing its 2020 second quarter financial and operating results for the quarter ended October 31, 2019. The press release reported in relevant part, "Abiomed, Inc. . . . today reported second quarter fiscal 2020 revenue of $205.0 million, an increase of 13% compared to revenue of $181.8 million for the same period of fiscal 2019."  During a conference call with investors and analysts held by the Company the same day, Defendant Trapp stated in relevant part:

> Based on our performance in the first half of the year and our projections for the next 6 months, we are maintaining our revenue guidance of 15% to 20%. That said, we acknowledge that the strategic actions we are implementing will take time and therefore are anticipating being toward the lower end of that range. Additionally, we are maintaining operating margin guidance of 28% to 30% for the fiscal year.

## DAMAGES TO ABIOMED

118.    As a direct and proximate result of the Individual Defendants' conduct, Abiomed has lost and expended, and will lose and expend, many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and its CFO and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Additionally, these expenditures include, but are not limited to, the excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company and whose compensation was excessive.

121.    As a direct and proximate result of the Individual Defendants' conduct, Abiomed has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

122.    Plaintiffs bring this action derivatively and for the benefit of Abiomed to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Abiomed, waste of corporate assets, unjust enrichment, and violation of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

123.    Abiomed is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

124.    Plaintiffs are, and have continuously been at all relevant times, shareholders of Abiomed. Plaintiffs will adequately and fairly represent the interests of Abiomed in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

125.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

126.    A pre-suit demand on the Board of Abiomed is futile and, therefore, excused. At the time of the filing of this action, the Board consists of the following seven individuals: Defendants Minogue, Puhy, Rivet, Sutter, Thomas and Van Gorder (the "Director-Defendants")

and non-party Rose (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to four of the seven Directors who were on the Board at the time this action was commenced.

127.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of over $18.9 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

128.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. That fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

129.    Additional reasons that demand on Defendant Minogue is futile follow. Defendant Minogue has served as the Company's President, CEO, and as Chairman of the Board since 2004. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Minogue with his principal occupation, and he receives handsome compensation, including $19,243,230 during the fiscal year ended March 31, 2019. Defendant Minogue was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the aforementioned press releases and the 2Q19 10-Q, 3Q19 10-Q and the 2019

Verified Shareholder Derivative Complaint

10-K, all of which he signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Minogue is a defendant in the Securities Class Actions. Furthermore, he could not impartially consider a demand to take action against himself for causing the Company to award him excessive and unjust compensation. For these reasons, too, Defendant Minogue breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant Puhy is futile follow. Defendant Puhy has served as a Company director since 2003 and Lead Director since 2005. She also serves as the Chairman of the Audit Committee and as a member of the Regulatory and Compliance Committee.  Defendant Puhy receives handsome compensation, including $294,661 during the fiscal year ended March 31, 2019. As a long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Puhy signed, and thus personally made, the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Puhy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Rivet is futile follow. Defendant Rivet has served as a Company director since 2016. She also serves as a member of the

Verified Shareholder Derivative Complaint

Compensation Committee and as a member of the Audit Committee. Defendant Rivet receives handsome compensation, including $267,161 during the fiscal year ended March 31, 2019. As a long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Rivet signed, and thus personally made, the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Rivet breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

132.    Additional reasons that demand on the Defendant Sutter is futile follow. Defendant Sutter has served as a Company director since 2008. He also serves as Chairman of the Governance and Nominating Committee and as a member of the Compensation Committee. Defendant Sutter receives handsome compensation, including $267,161 during the fiscal year ended March 31, 2019. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sutter signed, and thus personally made, the false and misleading statements in the 2019 10-K. His insider sales before the fraud was exposed, which yielded at least $18.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Sutter breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133.    Additional reasons that demand on Defendant Thomas is futile follow. Defendant Thomas served as a Company director since 2011. He also serves as Chairman of the Compensation Committee, as a member of the Governance and Nominating Committee and as a member of the Regulatory and Compliance Committee. Defendant Thomas receives handsome compensation, including $269,661 during the fiscal year ended March 31, 2019. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Thomas signed, and thus personally made, the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Thomas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

134.    Additional reasons that demand on Defendant Van Gorder is futile follow.[5] Defendant Van Gorder has served as a Company director since 2016. He also serves as a Chairman of the Regulatory and Compliance Committee and as a member of the Governance and Nominating Committee. Defendant Van Gorder receives handsome compensation, including $264,661 during the fiscal year ended March 31, 2019. As a Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Van Gorder signed, and thus personally made, the false and misleading statements in the 2019 10-K. Defendant

_____

[5] Defendant Van Gorder is the CEO of Scripps Health, a company that purchases Abiomed's products and services. The Company recognized $2.4 million in revenues from Scripps Health during the fiscal year ended March 31, 2019.

Verified Shareholder Derivative Complaint

Van Gorder is beholden to Scripps Health, which provides him with his primary source of income and also purchases products and services from the Company. Defendant Van Gorder is therefore unlikely to consider a demand made against Defendant Minogue in order to maintain the beneficial relationship the Company shares with Scripps Health. For these reasons, too, Defendant Van Gorder breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

135.    Additional reasons that demand on the Board is futile follow.

136.    As described above, one of the Director-Defendants directly engaged in insider trading, in violation of federal law. Defendant Sutter received proceeds of over $18.9 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

137.    Demand in this case is excused because the Directors control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, non-party director, Rose, has served as a Company director since 2014 and formerly served as a Company director from 2007 until 2012. He also serves as a member of the Audit Committee with Defendants Puhy and Rivet. Thus, demand is likely futile as to Rose as well.

138.    In violation of the Code of Conduct and the Charter of the Audit Committee, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets and violation of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

139.    Abiomed has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Abiomed any part of the damages Abiomed suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

140.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

141.    The acts complained of herein constitute violations of fiduciary duties owed by Abiomed officers and directors, and these acts are incapable of ratification.

142.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Abiomed. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Abiomed, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

143.    If there is no directors' and officers' liability insurance, then the Directors will not cause Abiomed to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

144.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

145.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

146.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

147.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

148.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

149.    Under the direction and watch of the Directors serving on the Board during the issuance of the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was experiencing declining revenue growth; (2)  the Company  did not implement  an adequate plan to prevent and/or mitigate its declining revenue growth; (3) as a result, the Company was  unlikely to reinstate revenue growth over the next several fiscal quarters; (4)  due to (1)-(3), Abiomed would likely need to revise its full fiscal year 2020 guidance in a way that would disappoint the Company's prior projections and market expectations and; (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

150.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based compensation," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated. Thus, making the executive compensation undeserved and excessive and the shareholders unable to make informed votes in the 2019 Proxy Statement.

151.    The 2019 Proxy Statement also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging in or permitting the issuing false and misleading statements to the investing public, and insider trading, the Individual Defendants violated the Code of Conduct. The 2019 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

152.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the advisory approval of executive compensation.

153.    The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Minogue, Puhy, Rivet, Sutter, Trap and Van Gorder, which allowed them to continue breaching their fiduciary duties to Abiomed.

154.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

155.    Plaintiffs on behalf of Abiomed have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

156.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

157.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Abiomed's business and affairs.

158.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

159.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Abiomed.

160.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

161.    The Individual Defendants further breached their fiduciary duties by causing themselves to receive excessive compensation from the Company given their misconduct.

162.    In yet further breach of their fiduciary duties owed to Abiomed, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was experiencing declining revenue growth; (2)  the Company  did not implement  an adequate

plan to prevent and/or mitigate its declining revenue growth; (3) as a result, the Company was unlikely to reinstate revenue growth over the next several fiscal quarters; (4)  due to (1)-(3), Abiomed would likely need to revise its full fiscal year 2020 guidance in a way that would disappoint the Company's prior projections and market expectations and; (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

163.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

164.    In breach of their fiduciary duties, one of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

165.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

166.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to

maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

167.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Abiomed has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

169.    Plaintiffs on behalf of Abiomed have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

170.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Abiomed.

172.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Abiomed that was tied to the performance or artificially inflated valuation of Abiomed, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

173.    The Individual Defendants were also unjustly enriched by causing themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct.

174.    Plaintiffs, as shareholders and representatives of Abiomed, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

175.    Plaintiffs on behalf of Abiomed have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

176.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

177.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

Verified Shareholder Derivative Complaint

178.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct and also relative to compensation provided at comparable companies irrespective of their misconduct, thereby wasting the Company's assets.

179.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

180.    Plaintiffs on behalf of Abiomed have no adequate remedy at law.

## PRAYER FOR RELIEF

181.    FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Abiomed, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Abiomed;

(c)    Determining and awarding to Abiomed the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Abiomed and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Abiomed and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

Verified Shareholder Derivative Complaint

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Abiomed to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Abiomed restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: November 7, 2019                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           /s/ Phillip Kim_____
                                           Phillip Kim
                                           275 Madison Avenue, 40th Floor
                                           New York, NY 10016
                                           Telephone: (212) 686-1060
                                           Facsimile: (212) 202-3827
                                           Email: pkim@rosenlegal.com

                                           *Counsel for Plaintiffs*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Robert Benward am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 11/3/2019_____, 2019.

Robert Benward

## **VERIFICATION**

I, Julie Kim-Zajonz am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of __11/3/2019__, 2019.

_____
Julie Kim-Zajonz